# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

| | | |
|---|---|---|
| BETH ANN SMITH, | ) | |
| | ) | **DISPOSITIVE MOTION** |
| Plaintiff, | ) | |
| | ) | Civil Action Case Number |
| QUINTILES TRANSNATIONAL | ) | 5:04-CV-657-OC-10GRJ |
| CORP., INNOVEX, INC., ORTHO | ) | |
| BIOTECH, INC., CRAIG PHILLIPS | ) | |
| and WILBERTO ORTIZ, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### DEFENDANT INNOVEX, INC.'S
### MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM

Plaintiff brought this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), and the Age Discrimination in Employment Act ("ADEA") against her employer, Innovex, Inc. ("Innovex"), and Ortho Biotech, Inc. ("Ortho"), one of Innovex's customers.[1] Plaintiff asserted claims for assault and battery against two Ortho employees (Craig Phillips and Wilberto Ortiz), Innovex, and Ortho, and negligent supervision and retention claims against Innovex and Ortho. Plaintiff claims Innovex failed to accommodate her alleged disability and did not consider her for a position with Ortho because of her age. She also claims she was sexually harassed by Phillips and Ortiz, and terminated in retaliation for reporting that harassment.

## I.  FACTUAL SUMMARY

### A.  **Innovex's Business and its Relationship with Ortho**:  Innovex provides

educational, sales, and marketing services for the pharmaceutical and healthcare industries.

---

[1] Innovex is a subsidiary of Quintiles Transnational Corp. ("Quintiles"). (Kelley Moye Dep.: 10). Plaintiff has asserted these same claims against Quintiles, as discussed in Quintiles's contemporaneously-filed motion for summary judgment.

Ortho is a pharmaceutical company that markets Procrit, an anemia drug.  [Wilberto Ortiz

Dep. ("Ortiz"): 17, 83-84].  From April 2001 to June 2003, Plaintiff worked for Innovex as a

Nephrology Nurse Educator ("NNE").  [Beth Ann Smith Dep. ("Pl."): 84, 87, Ex. 3].[2]  The

NNE position was created to support pharmaceutical sales representatives ("Nephrology

Product Specialists" or "NPSs") employed by Ortho by conducting educational seminars and

workshops.  [Pl.: 89-91, Ex. 5; Ortiz: 17].  The NNE project began in 2001 pursuant to a

Master Services Agreement (the "MSA") between Innovex and Ortho.  (MSA: 1).  Innovex

was responsible for recruiting and hiring the NNEs, who remained under the direct authority

and control of Innovex.[3]  [Id.; Leon Robinson Dep. ("Rob."): 13, 30].  Ortho employees did

not have input into the NNEs' salaries or performance evaluations or have the authority to

discipline, promote, or demote the NNEs.  [Pl.: 348; Rob.: 74, 79-80; Beth Morgan Dep.

("Mor."): 36-37; Ortiz: 26].  Such decisions were made by Innovex management.[4]  [Jennifer

Bonsall Dep. ("Bon."): 21; Mor.: 12, 17, 33, 63-64, 70-71; Rob.: 107-08].

  **B.**  **The Role of the NNEs:**  NNEs conduct educational programs for Ortho's

customers, including physicians, their office staff, and patients.  (Pl.: 89-90, Ex. 5; Rob.: 16;

Ortiz: 25).  Ortho cannot promote Procrit for any use not approved by the Food and Drug

---

[2]  All cited deposition excerpts and exhibits are included in the Appendix to Innovex's Motion for Summary Judgment.

[3]  Ortho managers interviewed some NNE candidates, but did not recommend or decide who Innovex hired. (Rob.: 78).  Innovex had exclusive responsibility for: maintaining personnel and payroll records; computing and paying all wages; providing liability and workers' compensation insurance coverage; establishing employee policies; administering benefits plans; addressing human resources, work performance, and work behavior issues; administering employee time-keeping, payroll, and reimbursement systems; and managing day-to-day employment issues for Innovex employees performing services pursuant to the MSA. (MSA: 4; Rob.: 79-80; Mor.: 36-37; Bon.: 21).  NPSs did not dictate which of their customers were called upon by the NNEs.  (Ortiz: 34).

[4]  Innovex did submit customer satisfaction surveys to Ortho, and an NNE's ratings on those surveys were taken into account when determining quarterly incentive bonuses. (Bon.: 22; Mor.: 37-38).  However, the results of those surveys accounted for only 10 percent of an NNE's possible bonus, or a maximum of $200-300 per year.  (Id.).

Administration ("FDA"), and Ortho provided FDA-approved materials and scripts to which

the NNEs had to adhere when making presentations.  (Pl.: 178-179, 222; Ortiz: 85).

Innovex's "Product and Promotional Literature" policy (Pl., Ex. 7) states:

> Package inserts, product labels and product promotional materials are closely
> regulated by the FDA.  Civil and criminal penalties may be imposed for violations of
> the FDA laws and regulations on product advertising and promotion…. You are not
> authorized to alter the promotional program or plan, except under the direction of your
> supervisor and our customer.  After you are trained on the proper implementation and
> use of the promotional program, you should "stick to the script."  Failure to comply
> will be grounds for immediate discipline, which may include termination.

    **C.**    **Plaintiff's Employment History with Innovex:**  Innovex hired Plaintiff in

April 2001.  (Pl.: 84, 87, Ex. 3).  Plaintiff's territory was northern Florida, and she worked

with multiple Ortho NPSs, including Ortiz and Cheryl Ward.[5]  (Pl.: 118).  Plaintiff was

initially supervised by Jennifer Bonsall, who was promoted in June 2001 to be Innovex's

Project Leader for the entire NNE program.  (Bon.: 6-7).  Ralph Marano supervised Plaintiff

from June 2001 until Beth Morgan became her supervisor in January 2003.  (Pl.: 101-02;

Mor.: 12).

    Throughout her employment, Plaintiff had issues with time management and report

accuracy.[6]  These issues were discussed with Plaintiff throughout her employment and in

---

[5] NPSs reported to Ortho management, including Craig Phillips, Meg Anderson, and Leon Robinson. (Ortiz: 18; Rob.: 57-58; Cheryl Ward Dep. ("Ward"): 19).  Phillips was the Eastern Regional Business Director for Ortho, and Robinson was the district manager for the district serviced by Plaintiff.  (Pl.: 143; Rob.: 11, 13). Anderson was Director of Marketing.  (Rob.: 85).  Neither the NPSs nor the Ortho managers working on the NNE project were employed by Innovex.  (Ortiz: 21; Rob.: 56-57; Ward: 21).  Innovex did not pay their compensation, provide their benefits, evaluate their job performance, or establish the terms and conditions of their employment.  (Ortiz: 21-23; Ward: 21-23).

[6] Bonsall and Morgan counseled Plaintiff on multiple occasions regarding her late reports and arriving late to client meetings.  (Bon.: 20; Pl., Ex. 16). As early as Plaintiff's 120-day performance review, she was warned that she needed to file more timely and accurate activity and expense reports.  (Pl.: 268-269, Ex. 14; Bon.: 55-58).  In her 2002 Performance Review, Marano noted that Plaintiff would be subject to disciplinary action if she failed to improve the timeliness and accuracy of her activity reports.  (Pl., Ex. 15).  Marano also noted that Plaintiff had been counseled on these issues before.  (Id.).

US2000 9762838.1

each of her annual performance reviews.  (Pl.: 270-71, 281-82, Ex. 15, 19; Bon.: 80, Ex. 11).

**D.     Plaintiff's Alleged Disability:**  Plaintiff testified that she has Rheumatoid

Arthritis ("RA") and occasionally displays some symptoms of Lupus, which causes her to

experience fatigue, joint inflammation, and pain in her limbs, hands, feet, and jaw.  (Pl.: 29-

31).  She claims that, at times, these symptoms make it difficult for her to dress, bathe, brush

her hair or teeth, walk, or lift objects, and that her symptoms can be exacerbated by stress or

lack of sleep.  (Pl.: 31).  When Plaintiff was hired by Innovex, she "self-identified" that she

was a special disabled veteran and suffered from arthritis.  (Pl.: 87-88, Ex. 3).  She stated that

she did not require any accommodations of her disability to perform the NNE duties.  (Id.).

Bonsall was not aware that Plaintiff had RA or any other health issues, and neither she nor

Morgan saw any indication that Plaintiff was unable to work because of her symptoms.  (Pl.:

348-349; Bon.: 25).  Plaintiff claims that she was denied sick leave, but admits that she was

only denied paid leave after her paid leave was exhausted.  (Pl.: 349-50).  Plaintiff was never

disciplined for taking sick days.  (Pl.: 246).

**E.     Innovex's Harassment Policies and Training:**  It is undisputed that Plaintiff

received harassment training in May 2001 and was aware of Innovex's policy prohibiting

sexual harassment and how to report harassment.[7]  (Pl.: 108-110, Ex. 9-10).  She also

received a copy of Innovex's "No Harassment" Policy, which states that Innovex will not

tolerate harassment of employees by Innovex's employees, customers, or vendors, and that

employees should report harassment immediately and will not be penalized for doing so.

---

[7]  During that session, Plaintiff received a copy of Innovex's Policy of Conduct, which expressly prohibits harassment or adverse treatment on the basis of sex.  (Pl., Ex. 7, 10).  Plaintiff also received instruction regarding the kinds of actions that might constitute sexual harassment or create a hostile work environment, including unwelcome sexual advances or requests for sexual favors.  (Pl.: 110, Ex. 7, 9-10).

(Pl.: Ex. 10).  The policy specifies multiple avenues for an employee to report harassment, including alternatives for follow-up reporting if she does not believe a complaint has been handled properly by her supervisor.  (Pl. Ex. 9, 10).

**F.     Plaintiff's Violation of Company Policy:**  On January 22, 2003, Plaintiff attended an Ortho POA meeting at which the NNEs received training on a new Procrit marketing tool.[8]  (Pl.: 91-92, 178-79, 189, Ex. 11; Mor.: 40; Rob.: 85).  During the training session, Plaintiff asked the trainer about congestive heart failure ("CHF"), which Plaintiff knew to be an "off-label" use for Procrit.  (Pl.: 180-81, 219).  Plaintiff knew that NNEs were not allowed to discuss off-label uses for Procrit in front of Ortho or when making presentations, and she had been counseled in the past about "staying on message."  (Pl.: 180-81, 201, 219-21, Ex. 7; Bon.: 55, 60-61, Ex. 7).  Plaintiff's reference to CHF irritated Ortho's Director of Marketing, Anderson, who told Plaintiff that the suggested use was inappropriate and should not be mentioned again.  (Pl.: 180-83; Bon.: 51).  Bonsall was also present and could see that Anderson was upset.  (Bon.: 54).  A senior nurse with Ortho also expressed concern that Plaintiff's reference to CHF could mean that she was making similar references in the field.[9]  (Mor.: 41, 52).

The next day, Morgan and Bonsall met with Plaintiff regarding her improper

---

[8]  Ortho hosts POA (Plan of Action) meetings each year to provide Ortho with the opportunity to strategize for the upcoming sales quarter, and to conduct seminars, workshops, and training.  (Ortiz: 38-39; Rob.: 18-19).  POA meetings usually last three to four days.  (Rob.: 19).  Ortho hosts optional social functions, such as dinners and cocktail receptions, during its POA and sales meetings.  (Ortiz: 39-41).

[9]  After the training session, the NNEs gave individual presentations.  (Pl.: 183-184; Mor.: 41, 48-49). Many of the NNEs mentioned CHF during their presentations.  (Pl.: 183-84, 219; Rob.: 85).  Anderson complained to District Manager Robinson that the NNEs had made inappropriate references during their presentations.  (Rob.: 85).  Robinson expressed these concerns to Plaintiff.  (Pl.: 192).

reference to CHF and explained that the customer was upset.[10]  (Pl.: 185-86; Mor.: 51-53).  It

is undisputed that they told Plaintiff that she would be disciplined for this incident.  (Pl.:

186).  Morgan and Bonsall began working with Innovex HR to determine the proper

discipline for Plaintiff's offense.  [Bon.: 36-37, 64; Chris Marcello Dep. ("Mar."): 16, 20-21].

They decided that a 90-day Performance Improvement Plan ("PIP") was appropriate and

began drafting that document.  (Mar.: 20-21).  Before Bonsall issued the PIP, she got a call

from Ortho District Manager Robinson, who stated that Plaintiff had complained to Ortiz and

two other NPSs about Robinson's leadership skills and about other NNEs and NPSs.  (Pl.:

190, 193; Bon.: 37).  Bonsall decided that Plaintiff's conversation with the NPSs required

attention as well.  (Bon.: 36-37).

On January 27, 2003, Bonsall discussed Robinson's complaint with Plaintiff.  (Pl.:

186, 198, 201, 231, Ex. 11, 12; Mar.: 25).  Plaintiff testified that when she learned that Ortiz

had reported to Robinson that she was complaining about her job, she decided to report Ortiz

for harassment, and told Bonsall that her conversation with Ortiz was actually about his

earlier harassment.[11]  (Pl.: 189-90, 193, 213).  Bonsall immediately referred Plaintiff to HR,

telling Plaintiff that Bonsall could lose her own job if she did not report Plaintiff's claim that

Ortiz had engaged in inappropriate conduct.  (Bon.: 115; Pl.: 226-27, 235).  Plaintiff claims

that Bonsall also told her that she could fire her for anything.[12]  (Pl.: 229).  That same day,

---

[10]  This was not the first time that Plaintiff had given inappropriate information during a presentation—Bonsall had counseled Plaintiff about a similar issue early in Plaintiff's employment.  (Pl.: 278-79).
[11]  Plaintiff's allegations of harassment are discussed below.  Plaintiff does not recall how much detail she gave Bonsall, but believes she told her that Ortiz had exposed himself to her, grabbed his crotch, licked his lips, pulled on her pants, rubbed up against her, tried to touch her, and had looked over his glasses at her.  (Pl.: 94).  Bonsall testified that Plaintiff only claimed that Ortiz had engaged in "inappropriate conduct," and refused to elaborate.  (Bon.: 110).  Plaintiff never mentioned any harassment by Phillips to Innovex.  (Pl.: 243).
[12]  Bonsall denies making this statement to Plaintiff.  (Bon.: 38-39).

6

Bonsall called Innovex Senior HR Manager Christine Marcello to report her conversation with Plaintiff.[13]  (Bon.: 39; Mar.: 7).  Marcello promptly followed up with Plaintiff.  (Pl.: 229-30).  Plaintiff testified that she told Marcello that Ortiz stared at her, tried to grab her, tried to look at her underwear, and brushed up against her.[14]  (Pl.: 231-32).  Marcello asked Plaintiff to complete a report, but Plaintiff refused.  (Pl.: 232-33).  Marcello told Plaintiff to call her back if she changed her mind.  (Pl.: 232, 234).

As previously planned, Bonsall placed Plaintiff on the PIP for the training incident and also referenced Plaintiff's conversation with Ortiz, noting that her behavior was unprofessional.[15]  (Pl.: 198, Ex. 11).  The PIP stated that Plaintiff needed to read presentations verbatim and would be subject to further discipline, including termination, if she failed to improve her messaging.  (Id.).  Plaintiff was given tasks to help improve her performance, including submitting daily activity reports and weekly success reports by 8:00 p.m. the day each report was due.[16]  (Id.).  Morgan and Bonsall also conducted several field visits to observe Plaintiff while she was on the PIP.  (Pl.: 273-76; Ex. 16, 17).

Plaintiff claims that the reporting requirements of the PIP aggravated her RA symptoms, and that she occasionally asked if she could submit her reports a day late.  (Pl.:

---

[13]  Marcello works at Innovex's headquarters in Parsippany, New Jersey.  (Mar.: 8).

[14]  Plaintiff testified that she does not recall whether she told Marcello that Ortiz had exposed himself. (Pl.: 231-232).  Marcello denies that Plaintiff made any claims of sexual harassment.  (Mar.: 10).

[15]  Bonsall and Morgan had previously made it clear to all of the NNEs that any problems with NPSs or Ortho's district manager should be reported to Innovex, and that the NNEs were not to complain to anyone else about its customer, Ortho.  (Bon.: 24).  Bonsall originally created two separate documents—the PIP and a warning letter regarding the conversation with the NPSs, but Marcello decided that it made more sense to combine the two documents, and Bonsall incorporated the warning letter into the PIP.  (Bon.: 35-36, Ex. 6; Mar.: 71-72).

[16]  The daily activity reports were to include details regarding the physicians on whom Plaintiff called each day.  (Pl., Ex. 11).  The NNEs were already expected to enter information regarding their calls and formulate pre-call plans detailing the needs of the physician and the objective for the call.  (Mor.: 79-81).  The weekly success reports, which should have taken about an hour to prepare, were to include details regarding her three most effective calls each week.  (Pl.: Ex. 11; Mor.: 83).

US2000 9762838.1

244).  However, Plaintiff admits she had difficulty submitting timely reports because she was

"driving like a mad woman" to get from one appointment to the next.  (Pl.: 245-46, 252-53).

Bonsall and Morgan told Plaintiff the reports needed to be timely to teach her to efficiently

schedule visits within her territory.  (Pl.: 247).  Although Plaintiff did not always submit

timely reports while on the PIP, she was never disciplined for late reports.[17]  (Pl.: 246).

Plaintiff successfully completed the PIP, which was noted in her June 12, 2003

performance review.  (Pl.: 281, Ex. 19).  On that review, she received an "exceeds

expectations" rating in the areas of professionalism and self-development and was praised for

her clinical knowledge.  (Id.).  Plaintiff was reminded that she needed to improve in the area

of submitting timely reports, but received an overall rating of "meets expectations."[18]  (Id.).

**G.** **Plaintiff's Termination**:  On June 18, 2003, Plaintiff was scheduled to give a

2:00 p.m. educational program at Florida Hospital in Deland, Florida for patients of

Nephrology Consultants.  (Pl.: 295, 297).  Plaintiff should have arrived 45 minutes to an hour

early to prepare for the presentation and set up refreshments.  (Pl.: 304; Bon.: 94; Mor.: 93-

94).  Plaintiff had scheduled two business appointments in Jacksonville, Florida before the

Deland program.  (Pl.: 297-98).  The 110-mile drive between the two cities takes at least two

hours, and Plaintiff had to stop on the way to pick up refreshments.  (Pl.: 302, 317, Ex. 20).

However, she did not leave Jacksonville until 11:30 a.m., only two-and-one-half hours before

the program's start time, and hit traffic and rain on the way.  (Pl.: 313, 315, 296, Ex. 20).

Plaintiff should have had with her the name and telephone number for her contact at

---

[17]  Plaintiff was not disciplined for any reason while on the PIP and was not denied any bonuses or opportunities for promotion.  (Pl.: 246, 250-51).

[18]  Plaintiff had received "meets expectations" ratings on her previous evaluations.  (Pl.: 280-281).

US2000 9762838.1

the hospital in case she was running late, but she did not, and had to call OnStar to get the hospital's number.  (Pl.: p. 311, Ex. 20; Bon.: 91; Mor.: 93-94).  When she called the hospital around 2:00 p.m., she spoke to the operator, who transferred her to Jessica Garbacik in HR. (Id.).  Plaintiff accepted Garbacik's offer to tell the waiting patients that Plaintiff would be late and to leave a sign-in sheet for patients who did not wish to wait.  (Pl.: 312, Ex. 20).  By 2:40 p.m., forty minutes after the program was scheduled to start, Plaintiff had still not arrived.  (Pl.: Ex. 20).  Because she was so late, members of the hospital staff became upset and called Ortho's home office.  (Pl.: 305-306; Rob.: 95).  The assistant to Ortho's Regional Business Director called Bonsall and told her that the Director was "quite upset," and had already contacted Robinson to tell him that a group of 25 patients was left waiting.  (Pl.: 305-06; Bon.: 86-87; Mor.: 96).  Bonsall called Plaintiff and told her to contact the appropriate hospital staff member.  (Bon.: 87-88).  Plaintiff spoke to a secretary for Nephrology Consultants, who stated that she had received an angry call from Florida Hospital about the incident.  (Pl., Ex. 20).  When Plaintiff finally arrived, all the patients had already left.  (Pl.: 314).

Plaintiff's lateness, coupled with her failure to contact the proper parties regarding her lateness, irritated Ortho, the patients, the practice, and the hospital, and Bonsall considered this to be a major customer failure.[19]  (Bon.: 96, 103, 107).  Neither NNEs nor NPSs are permitted to make lists of patient names or contact patients directly.[20]  (Rob.: 94;

---

[19]  This was not the first time Plaintiff was late to an important event.  (Bon.: 103-05; Ward: 41,114). Plaintiff was also late for a speaking engagement at a conference, and it is undisputed that Bonsall had received complaints from NPSs Ward and Rick Johnson regarding Plaintiff's late arrival for educational programs. (Bon.: 104-107; Ward: 41, 114, 117).

[20]  Although the NNEs used patient sign-in sheets at the inception of the NNE program, that practice was discontinued in response to changes to the Health Insurance Portability and Accountability Act ("HIPPA"), and

9

Mor.: 102-103).  Having the hospital staff create a sign-in sheet for the patients who chose

not to wait for Plaintiff violated this policy.  (Mor.: 102-103).  In discussing Plaintiff's

tardiness, it was also discovered that she had violated Innovex and Ortho policies by using an

advertising flyer listing her voicemail number for patients to call.[21]  (Pl.: 320; Mor.: 103-04;

Bon.: 74-75, 78-79).

      Bonsall and Morgan contacted Marcello to discuss how the matter should be

handled.[22]  (Mar.: 16-17).  They were very upset, as were the customers.  (Mar.: 17 ; Mor.:

102-103; Bon.: 81).  Plaintiff had committed several violations of Innovex and Ortho

policies, and possibly federal privacy laws, and it had only been six months since Plaintiff

had been placed on a PIP for another customer-related problem.  (Id; Pl., Ex. 11).  Marcello

approved Morgan's and Bonsall's recommendation to terminate Plaintiff's employment.

(Mor.: 92; Bon.: 108).

      **H.**     **Plaintiff's Allegations of Harassment:**  Plaintiff claims that she was sexually

harassed by two Ortho employees.  She claims that Craig Phillips, Ortho's Eastern Regional

Business Director, harassed her on one occasion and that Ortiz harassed her on several

occasions.  (Pl.: 142-143).  All of the alleged harassment occurred more than 300 days before

she filed a charge of discrimination on November 5, 2003.  (Pl.: Ex. 21).

      **1.**     **Craig Phillips:**  Plaintiff claims that Phillips harassed her during an

---

NNEs were told to the destroy the template used to create them.  (Bon.: 81).  Plaintiff completed a course titled "Privacy Awareness: Basic Training" regarding HIPPA regulations on April 9, 2003, and received annual training regarding patient privacy from Innovex.  (Bon.: 73-74; Mar.: Ex. 5).

[21]  Plaintiff contends that the flyer was produced by an NPS.  However, NNEs were given strict instructions that they, not the NPSs, were responsible for the educational programs, including scheduling any presentations and producing related flyers.  (Bon.: 76, 78-79).  Patients were to contact their doctors to register for programs, and NNEs were to receive no information other than the number of attendees.  (Bon.: 81-82).

[22]  Neither Morgan nor Bonsall has the authority to terminate an employee.  (Mor.: 92; Bon.: 108). Human Resources had to review the recommendation to terminate Plaintiff.  (Mar.: 13).

US2000 9762838.1

October 2001 POA meeting in Dallas, Texas.  (Pl.: 131).  Plaintiff engaged in a game of pool in Ortho's hospitality suite with three Ortho employees, including Phillips.  (Pl.: 131-32).  The Ortho employees allegedly joked about what it would be like if various co-workers had sexual encounters and what the resulting offspring might look like.  (Pl.: 132-33).  They did not discuss themselves or Plaintiff as part of the joke.  (Id.).  Plaintiff claims that Phillips later came to her hotel room with a bottle of wine.  (Pl.: 135).  When Plaintiff let Phillips in, he sat on one of the beds.  (Pl.: 137).  When Plaintiff sat down next to him, Phillips allegedly told her that he cared for her and thought she was pretty.  (Id.).  Plaintiff claims that Phillips also began to touch and kiss her, pushed her back on the bed and fondled her.  (Pl.: 137-38).  Plaintiff claims that after she asked Phillips several times to stop touching her and to leave, she pushed him off of her.  (Pl.: 139-40).  Plaintiff alleges that before leaving her room, Phillips put his hand on the back of her neck and said, "no one needs to know about this, right?"  (Pl.: 140).  Although Plaintiff saw Phillips after that encounter, she had no further issues with him.  (Pl.: 142-43).  She did not report this incident to anyone at Innovex.  (Pl.: 141).

  **2.**   **Wilberto Ortiz:**  Plaintiff testified that Ortiz sexually harassed her between January 2002 and December 2002.  (Pl.: 146, 171).  Plaintiff admits she had only intermittent contact with Ortiz.  (Pl: 151).  Absent a special event, Plaintiff only saw Ortiz in the field once every three months or at Ortho meetings around three times per year.  (Pl.: 151; Ortiz: 36-37).

  The first alleged incident of harassment by Ortiz was at a POA meeting in January 2002.  (Pl.: 146).  Ortiz believed that Plaintiff was flirting with him and invited her to his

room.  (Ortiz: 50, 52-53; Pl.: 146).  Ortiz, who was alone when Plaintiff arrived, opened the

door and let her into the room.[23]  (Pl.: 146-47; Ortiz: 54).  Plaintiff testified that she does not

know what Ortiz was wearing, but Ortiz recalls that he was wearing work-out shorts and a t-

shirt.  (Pl.: 149; Ortiz: 55).  Ortiz asked Plaintiff what kind of undergarments she was

wearing.  (Pl.: 148; Ortiz: 56).  Ortiz then sat down on one of the two beds in the room, and

Plaintiff sat facing him on the other bed.  (Pl.: 147; Ortiz: 58-59).  Ortiz asked Plaintiff if she

was romantically involved with anyone and if she was sexually interested in him, to which

Plaintiff replied that Ortiz was married and that God would not approve.  (Pl.: 148,150; Ortiz:

57-58).  Ortiz never asked Plaintiff to have sex with him, and Plaintiff did not tell Ortiz that

his conduct was unwelcome or that she thought it was harassment.  (Pl.: 148; Ortiz: 61-62).

When Plaintiff got up to leave, Ortiz apologized, and she sat back down.  (Pl.: 148-49; Ortiz:

61).  When Ortiz asked her about her underwear again, Plaintiff left the room.  (Id.).  Plaintiff

did not report this incident to Innovex.  (Pl.: 151).

The next incident of alleged harassment occurred six months later at a June 2002

meeting.  (Pl.: 154).  Plaintiff had asked Ortiz for instruction on using a projector, and he told

her that he could show her how to use it that day in his hotel room or in a conference room

the next day.  (Pl.: 156; Ortiz: 64).  Plaintiff chose to go to his hotel room.  (Pl.: 154-55;

Ortiz: 64-66).  Plaintiff testified that Ortiz removed his trousers while she was operating the

projector, but that she did not see his underwear or his genitals.  (Pl.: 157).  Ortiz did not

touch Plaintiff or make any romantic or sexual advances.  (Ortiz: 69).  Plaintiff claims she

---

[23]  Plaintiff originally claimed that Ortiz was in bed and under the covers when she arrived.  However, when asked how she got into the room if Ortiz was in bed and the only one in the room, Plaintiff testified that she could not recall how she got into the room, and that she had "never thought of that."  (Pl.: 147).

US2000 9762838.1

told Ortiz, "this is sexual harassment," and left the room.  (Pl.: 157).  Plaintiff did not report this incident to Innovex.  (Pl.: 157-58).

Plaintiff also claims that, on the limited occasions she saw him after June 2002, Ortiz did the following: followed her to her car; bumped into her; rubbed his elbow across her breast while walking by her; tried to look down the waistband of her pants; talked about her underwear and buttocks; looked over his glasses at her; made unspecified "snide comments"; told her she looked good for forty or that he "want[ed] some of that"; grabbed his groin; pursed his lips; appeared to undress Plaintiff with his eyes; and spoke Spanish.  (Pl.: 159-60). Plaintiff did not report these alleged actions to Innovex.  (Id.).

Plaintiff claims that she asked Bonsall and Morgan to transfer her out of Ortiz's territory during this time period.[24]  (Pl.: 160-61).  However, she had not told Morgan or Bonsall that she was having any issues with Ortiz when she made those requests.  (Pl.: 160-62).  The NNE project had recently added more NNEs, which led to territory changes.  (Bon.: 116).  Plaintiff had established relationships with some Ortho accounts and they wanted to keep her in those accounts rather than assign them to new NNEs.  (Pl.: 248; Bon.: 116-17).

In October 2002, Plaintiff attended a meeting in South Carolina.  (Pl.: 167-68).  Ortho and Innovex employees divided into district-based teams for a scavenger hunt.  (Id.; Ortiz: 70-71).  There were at least six people, including Ortiz, on Plaintiff's team, and the team stayed together throughout the exercise.  (Pl.: 168; Ortiz: 72).  Plaintiff claims that Ortiz stood behind her shaking his head, pursing his lips, and moaning.  (Pl.: 168).  No one else witnessed this behavior, and Plaintiff did not report it to Innovex.  (Pl.: 168, 171).

---

[24]  Plaintiff serviced only one doctor in Ortiz's territory, Dr. Ahmed in Melbourne, and only conducted educational programs for that customer once every three months  (Ortiz: 93-94; Rob.: 25).

The final incident of alleged harassment occurred in December 2002 at a Christmas party at Robinson's home.  (Pl.: 171).  The NPSs and NNEs from the district were invited to the party, but Plaintiff was not required to attend.  (Pl.: 172; Ortiz: 76-77).  Ortiz attended with his wife and children.  (Pl.: 172-73; Ortiz: 77-78).  Plaintiff and Ortiz did not talk to one another at the party, but she claims that he stared at her and that she saw him licking his lips while rolling his eyes.  (Ortiz: 78; Pl.: 172).  Plaintiff also claims that Ortiz grabbed himself. (Pl.: 173).  Although they were in a crowd, including Ortiz's wife, Plaintiff did not bring Ortiz's actions to anyone's attention.  (Id.).  However, Plaintiff testified that she knew she needed to tell someone about Ortiz's alleged harassment.  (Id.).

Rather than follow Innovex's harassment policy and report Ortiz's alleged actions to her supervisor or HR, Plaintiff claims she confronted Ortiz directly at the same January 2003 POA meeting at which she had inappropriately mentioned CHF.  (Pl.: Ex. 11, 12).  This conversation took place <u>after</u> Plaintiff had been told she would be disciplined for her comments during training earlier that day.[25]  (Pl.: 186-87, 214-216, 218, 224, Ex. 13). Plaintiff claims that, after a group dinner on January 23, 2003, she told Ortiz that his behavior was affecting her job and causing her stress, which was aggravating the symptoms of her disease, and that she would report him if his conduct did not change.  (Pl.: 186-87, 189, 214-216, Ex. 13).  Ortiz appeared sympathetic and apologized to Plaintiff.  (Pl.: 188). Plaintiff had not reported any of Ortiz's conduct to Innovex.  (Pl.: 189).  Plaintiff believed that the problem was resolved after her conversation with Ortiz.  (Id.).  It is undisputed that

---

[25]  Plaintiff saw Ortiz daily during the six-day POA meeting, but did not confront Ortiz until the last night of the meeting, after she had been reprimanded for mentioning CHF in training.  (Pl.: 214-215; Ex. 11, 13; Ortiz: 81).

Ortiz never harassed Plaintiff after that conversation.  (Pl.: 289-91, 295).

Plaintiff filed a charge of discrimination with the Florida Commission on Human

Relations on November 5, 2003 alleging sex and disability discrimination and retaliation.

II.     **ARGUMENT AND CITATION OF AUTHORITY**

Summary judgment is appropriate where, as here, "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).

**A.     Plaintiff's Title VII Sexual Harassment Claims are Time-Barred**:  Under

Title VII, a Florida plaintiff is required to file a charge of discrimination within 300 days of

the alleged misconduct.  Matthews v. City of Gulfport, 72 F. Supp. 2d 1328, 1334 (M.D. Fla.

1999).  A claim is time-barred if a charge is not filed within the established time limits.  Nat'l

R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 108-109 (2002).  Plaintiff claims that she

was sexually harassed by Phillips in October 2001 and by Ortiz between January 2002 and

December 2002 and that their alleged actions created a hostile work environment.  Even if

these actions are treated as a single practice rather than discrete acts of discrimination, at

least one incident of harassment must have occurred within the 300-day period preceding

Plaintiff's charge.[26]  Morgan, 536 U.S. at 117.  Therefore, Plaintiff must identify an act of

harassment that occurred on or after January 9, 2003 for her November 5, 2003 charge to be

---

[26] Not all of the complained-of incidents are sufficiently related to one another to compose a single
employment action.  Morgan, 536 U.S. at 107-108.  Specifically, Plaintiff has not presented any evidence that
the single, isolated incident with Phillips is any way related to the later alleged actions of Ortiz.  Geer v. Marco
Warehousing, Inc., 179 F. Sup. 2d 1332, 1338 (M.D. Ala. 2001) (actions are not part of continuing violation
when committed by different actors who did not act in concert with or at the same time as the actor whose
actions serve as the anchor for the plaintiff's claims.

timely.  However, Plaintiff testified that the last incident of harassment by Ortiz occurred in

December 2002.[27]  While Plaintiff contends that Innovex failed to remediate the harassment

she allegedly reported, such failure does not extend the filing period.  Geer v. Marco

Warehousing, Inc., 179 F. Supp. 2d 1332, 1339 (M.D. Ala. 2001).  That is particularly clear

in this case, where the complained-of harassment ceased before Plaintiff allegedly reported it

to Innovex.  See Burrell v. City Univ. of New York, 995 F. Supp. 398, 407 (S.D.N.Y. 1998).

The law does not permit Plaintiff to save her time-barred claim by linking it to Innovex's

alleged failure to take action, even when that alleged failure occurred within the limitations

period.  Id.; Speer v. Rand McNally & Co., 123 F.3d 658, 664 (7th Cir. 1997).  Accordingly,

Plaintiff's hostile work environment claim should be dismissed as time-barred.

**B.      Plaintiff Cannot State a Hostile Work Environment Claim:**  Even if

Plaintiff's sexual harassment claim were not time-barred, Innovex is still entitled to summary

judgment on that claim because Plaintiff cannot show any basis for holding Innovex liable

for the alleged harassment.  See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81

(1998); Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).  Moreover,

she cannot show that she was subjected to unwelcome sexual harassment that was

sufficiently severe or pervasive to alter the terms and conditions of her employment.  Id.

Because the alleged harassment was committed by employees of Innovex's customer,

Innovex is only liable for harassment of which it had notice if it failed to take immediate and

corrective action.  Watson v. Blue Circle, Inc., 324 F.3d 1252, 1259 (11th Cir. 2003).  The

---

[27]  The only issue with Ortiz alleged by Plaintiff that occurred after January 9, 2003 was when Ortiz "must have figured out that I didn't file a formal complaint," and appeared to be making fun of her.  (Pl.: 288-291).  However, to be considered part of a hostile work environment, an act must be of a sexual nature or gender-related.  Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000).  Plaintiff admitted that she did not believe that Ortiz was sexually harassing her with his comment.  (Pl.: 290-291).

16

last act of harassment identified by Plaintiff occurred in December 2002.  Plaintiff claims

that she first reported the past harassment to Bonsall on January 27, 2003.  (Pl.: 285).  There

is no basis for holding Innovex liable for harassment about which it was unaware until after

that alleged harassment had ended.[28]  Hartleip v. McNeilab, Inc., 83 F.3d 767, 777 (6th Cir.

1996) (employer not liable where employee failed to provide notice of harassment to

employer until six months after alleged harassment ceased); Fulmore v. Home Depot USA,

Inc., No. 1:03-CV-0797DFHVSS, 2006 WL 839459, at * 16 (S.D.Ind. March 30, 2006)

(employer not liable for harassment by customer where employer had no control over

customer and where harassing behavior had ceased).

   To prove that the alleged harassment was sufficiently severe or pervasive, Plaintiff

must show that her work environment was " both objectively and subjectively offensive, one

that a reasonable person would find hostile or abusive, and one that [she] in fact did perceive

to be so."  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).  Only statements or

actions of a sexual or gender-related nature may be considered in determining whether the

conduct about which Plaintiff complains created a hostile work environment.  Gupta, 212

F.3d 571 at 583.  Many of Ortiz's alleged actions, such as shaking his head, rolling his eyes,

pursing and licking his lips, moaning, telling Plaintiff that she looked good for her age,

staring, speaking Spanish to Plaintiff,[29] making unspecified "snide" comments, looking over

his glasses at Plaintiff, and bumping into Plaintiff, are not actions that a reasonable person

would consider to be of a sexual nature or even gender-related and should not be considered

---

[28]  Plaintiff testified that when she and Morgan discussed Plaintiff's 2003 Performance Evaluation in June 2003, Morgan asked Plaintiff whether she had had any further problems with Ortiz, and Plaintiff said she had not.  (Pl.: 285).

[29]  Plaintiff later testified that Ortiz spoke Spanish to her because he believed her to be of Spanish descent.  (Pl.: 333-334).

US2000 9762838.1

in support of Plaintiff's claim.  Id.; see also Mendoza v. Borden, Inc., 195 F.3d at 1249-50.

For conduct that is or reasonably appears to be of a sexual or gender-related nature, courts look at four factors to determine whether harassment objectively altered an employee's terms and conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; (4) and whether the conduct unreasonably interferes with the employee's job performance.  Gupta, 212 F.3d at 584.  Here, the alleged conduct was isolated and infrequent.  It is undisputed that the alleged harassment by Phillips was limited to a single incident in October 2001.  It also undisputed that Plaintiff had only intermittent contact with Ortiz.  (Pl.: 151; Ortiz: 26).  Indeed, when asked why she failed to report Ortiz's alleged harassment, Plaintiff testified:

> I did not work with him every single day.  So kind of out of sight, out of mind.  He wasn't harassing me every day, but it was like, whenever I would have to go to these meeting and then they would put me in his accounts, it would—obviously that's when he would have an opportunity to say or do anything.  So, the fact that I was intermittently exposed to him, although that doesn't excuse what happened, it didn't—it wasn't like it was in my face every day.

Pl.: 151.

Although Plaintiff worked for Innovex and on the same project with Ortiz for more than two years, she has only alleged three isolated incidents of sexual or gender-related conduct by Ortiz: the January 2002 incident when he asked Plaintiff about her underwear and if she was sexually interested in him; the June 2002 incident when he allegedly removed his trousers without exposing his underwear or genitals; and, an October 2002 incident when he grabbed his groin.  Plaintiff also claims that between June 2002 and December 2002, Ortiz: rubbed his elbow across her breast while walking by; tried to look down the waistband of her

pants; talked about her underwear and buttocks; told her that he "want[ed] some of that"; and grabbed his groin. There is no evidence that any of these alleged actions occurred more than once during that six-month period. Plaintiff has thus not shown that these incidents amounted to the sort of continuous barrage of harassment that the Eleventh Circuit deems actionable.[30] The law is clear that such sporadic and infrequent statements and events are insufficient to alter the terms or conditions of employment, and therefore do not support Plaintiff's claim. See Mendoza., 195 F.3d at 1246-1247 (detailing cases).

Plaintiff must also show that the conduct was physically threatening, humiliating, and severe. However, none of the incidents of alleged harassment identified by Plaintiff meet the requisite level of severity. Indeed, the Eleventh Circuit held that telling a plaintiff, "I'm getting fired up," making sniffing sounds while looking at her groin area, rubbing up against the plaintiff's hip while touching her shoulder and smiling, and constantly following the plaintiff around did not constitute severe or pervasive harassment.[31] Mendoza, 195 F.3d at 1249. Other courts have reached similar conclusions. See Otu v. Papa John's USA, Inc., 400 F. Supp. 2d 1315, 1327 (N.D.Ga. 2005) (no evidence of severe or pervasive conduct where supervisor rubbed her breasts against employee's back and attempted to rub his genitals on multiple occasions; tried to kiss and hug him; and tried to unbutton her blouse in front of

---

[30] See Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002) (finding that ethnic slurs made three to four times a day every day enough to establish that harassment was frequent); Dees v. Johnson Controls World Servs., Inc., 168 F.3d 417, 418 (11th Cir. 1999) (finding that almost daily abuse in the form of sexually explicit stories and jokes, comments about plaintiff's body, and physical harassment sufficiently severe).

[31] Compare Watson v. Blue Circle, Inc., 324 F.3d 1252, 1262 (11th Cir. 2003) (finding that defendant's conduct was severe where he brushed his hand across the plaintiff's buttocks, offered her money to have sex with him, grabbed plaintiff's hand and told her that he wanted to 'eat her', grabbed her by the wrists and shoved her, patted plaintiff's breast, tailgated her, and attempted to throw her in concrete). In this case, it is undisputed that Ortiz never asked Plaintiff for sex and never physically intimidated or abused her. Further, Plaintiff has not presented any evidence that Ortiz's alleged brushing of her breast while walking past her was intentional.

him); <u>Evans v. Mobile Infirmary Med. Ctr</u>., 2005 WL 1840235 at * 9, 11 (S.D.Ala. Aug. 2, 2005) (comments about plaintiff's breasts, grabbing her buttocks on two occasions, and touching her breast on one occasion not severe or pervasive).

Nor has Plaintiff shown that these few complained-of incidents unreasonably interfered with her employment.  Aside from her time-management problems and her mention of CHF at the January 2003 POA, Plaintiff enjoyed success in her position.[32]  And as Plaintiff herself testified, when Ortiz was out of her sight, she did not think about him. Although Plaintiff claims that stress can aggravate her RA symptoms, she testified that her symptoms improved in 2002—the same year during which all of Ortiz's alleged harassment occurred.  (Pl.: 271).

**C.    Plaintiff Cannot State a Claim for Retaliation:**  To state a claim for retaliation under Title VII, Plaintiff must demonstrate that: (1) she engaged in protected activity; (2) she suffered an adverse employment action or action that a reasonable employee would find materially adverse; and (3) there is a causal connection between the protected activity and the complained of actions.  <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 126 S.Ct. 2405, 2415 (2006); <u>Gupta</u>, 212 F.3d at 587.  Plaintiff claims that Innovex retaliated against her for her alleged January 2003 report of sexual harassment by placing her on the PIP, refusing to reassign her to another territory, and terminating her employment.  However, even assuming Plaintiff engaged in protected activity, which Innovex denies, she cannot state a prima facie case of retaliation based upon any of these decisions.

Plaintiff cannot establish a causal connection between her alleged protected activity

---

[32]  Plaintiff has never claimed that Ortiz or his alleged harassment had anything to do with her ongoing time management problems or her error during the training session.

and the decision to implement the PIP.  The undisputed evidence shows that Bonsall and

Morgan told Plaintiff that she would be disciplined for mentioning CHF during the training

session, and that they, in conjunction with HR, had decided to put her on a PIP and began

drafting it <u>before</u> Plaintiff allegedly reported harassment.[33]  Moreover, Plaintiff cannot show

the PIP was so severe that it might reasonably dissuade an employee from reporting

discrimination under similar circumstances.  <u>See</u> <u>Burlington</u>, 126 S.Ct. at 2415.  Employment

actions such as negative performance evaluations or performance improvement plans, by

themselves, do not meet the requisite level of severity.[34]  Plaintiff's pay and duties remained

the same, and she did not receive any further discipline while on the PIP.  And even though

Plaintiff did not always meet the PIP's reporting deadlines, she completed it successfully and

received a positive performance evaluation a few months later.

        Similarly, Plaintiff cannot show a causal connection between any complaint of

harassment and Innovex's refusal to transfer her.  Plaintiff claims that she made multiple

requests to transfer out of Ortiz's territory in 2002, but it is undisputed that she had not

reported any alleged harassment at the time she made those requests.  (Pl.: 160-162).

Although Plaintiff claims that she made similar requests after she reported Ortiz's harassment

in January 2003, Plaintiff has not shown that Innovex's continued refusal to honor that

request was because she reported harassment.  Nor can Plaintiff show that a reasonable

---

[33]   <u>See</u> <u>Marcelin v. Eckerd Corp. of Fla., Inc.</u>, No. 8:04-CV-491-T-17MAP, 2006 WL 923745, at *10 (M.D.Fla. Apr. 10, 2006) (the significance of temporal proximity is negated where the employer has concerns about the employee's performance that predate protected conduct).

[34]   <u>See</u> <u>McNichols v. Miami-Dade County</u>, No. 02-23034-CIV, 2006 WL 1104336, at *11 (S.D.Fla. Mar. 24, 2006) (citing cases holding that PIPs are insufficient to support retaliation claims absent a change in duties, pay, or position, and holding that negative evaluation and three-month extension of probationary period did not support retaliation claim); <u>Brown v. Sybase, Inc.</u>, 287 F.Supp.2d 1330, 1347 (S.D.Fla. 2003) (even under lighter burden in retaliation cases, placement on a PIP does not meet the "threshold level of substantiality.").

21

person would have found Innovex's refusal to transfer her to be materially adverse.  Plaintiff

testified that she believed Ortiz would stop harassing her after she confronted him in January

2003 and that he did in fact stop.  The requested transfer would not have resulted in a

promotion or pay increase, more prestige, or a change in duties.  Thus, the denial of a transfer

from a single account in Ortiz's territory does not meet the requisite level of severity to

support Plaintiff's retaliation claim.  See Reis v. Universal City Dev. Partners, Ltd, 442

F.Supp.2d 1238, 1253-1254 (M.D.Fla. 2006).

      Plaintiff cannot establish a causal connection between her alleged report of

harassment and her termination six months later.  Courts have consistently held that time

gaps of even less than six months are insufficient to establish a causal relation between the

protected activity and the complained-of action.[35]  Moreover, there is no evidence that

Innovex tried to create performance issues as an excuse to terminate Plaintiff's employment.

To the contrary, Plaintiff was placed on the PIP and completed it successfully even though

she was late with some of the required reports.  And aside from criticism regarding her

ongoing time-management problems, she received a positive performance evaluation just

days before she was terminated.  Innovex has articulated a legitimate business reason for

Plaintiff's termination—she failed to arrive for a scheduled educational program, failed to

properly notify her customer or supervisors that she would be late, and violated patient

---

[35]  See Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (citing affirmatively several court of appeals decisions for the proposition that a three to four month gap is insufficient to establish the causal relation prong in a retaliation case); Balletti v. Sun-Sentinel Co., 909 F.Supp. 1539, 1549 (S.D.Fla.1995) (lapse of six months between grievance and discharge did not permit inference of causal connection); Vandesande v. Miami-Dade County, 431 F.Supp.2d 1245, 1257 (S.D.Fla. 2006) (three-month lapse between complaint and alleged retaliation insufficient).  Plaintiff may argue that Morgan's alleged comment that Plaintiff should have slept with Ortiz indicates a retaliatory intent, but Plaintiff also testified that Morgan asked her whether the harassment had continued and Plaintiff told her it had not.  It undisputed that Plaintiff did not complain to anyone else after her alleged report in January 2003.

privacy policies by using a patient sign-in sheet and posting her voicemail number for patients. Plaintiff has no evidence of pretext.[36] It is undisputed that Ortho had complained about Plaintiff's tardiness in the past, and that she had been counseled about that problem. Plaintiff has not and cannot identify a single NNE who had a similar customer service failure but was treated more favorably.[37] (Pl.: 311). Thus, she has not shown that Innovex's reasons for her termination are false or that the real reason was retaliation.

   **D.     Plaintiff Cannot State a Claim of Disability Discrimination:** Plaintiff claims the reporting requirements of the PIP aggravated her RA symptoms and that Innovex failed to accommodate her alleged disability. To state a prima facie case of disability discrimination, Plaintiff must present evidence that: (1) she has a disability; (2) she can perform the essential functions of the position, with or without a reasonable accommodation; and (3) Innovex discriminated against her because of the disability. Holbrook v. City of Alpharetta, 112 F.3d 1522, 1526 (11th Cir. 1997). To prevail on a failure to accommodate claim, Plaintiff must also identify a reasonable accommodation that she was denied. Terrell v. USAir, 132 F.3d 621, 624 (11th Cir.1998).

   The ADA defines a disability as an impairment that substantially limits one or more major life activities. See 29 C.F.R. § 1630.2. Innovex does not dispute that Plaintiff has an impairment, but she has not shown that she is substantially limited in any major life activities. In determining whether Plaintiff is substantially limited, the Court should consider

---

[36] If Plaintiff establishes a prima facie case, the burden of production, not persuasion, shifts to Innovex to articulate a legitimate, nondiscriminatory reason for the challenged action, and Plaintiff must show that Innovex's articulated reason is pretextual. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).

[37] Nor has she identified any other NNEs who committed the same patient privacy policy violations but were treated more favorably that she. She certainly cannot identify any other NNE who committed all three violations at the same time, and cannot therefore meet the "nearly identical" standard for comparators applied in the Eleventh Circuit. See Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).

US2000 9762838.1

the nature and severity, duration, and permanent or long-term impact of the impairment.  See 29 C.F.R. § 1630.2(j).  Plaintiff claims that her RA symptoms occasionally limit her ability to drive, bathe, groom, and dress herself and to lift objects, and that some of those symptoms were aggravated by the PIP's reporting requirements.  Plaintiff testified that there were days while she was on the PIP when she experienced stiffness and swelling and needed help preparing meals, and when she could not lift her arm, drive, walk, or pull her pants down. (Pl.: 255-256).  However, the stiffness and swelling subsided after Plaintiff took her medication, and she could "do just about anything anybody else could do." (Id.).  Plaintiff has thus not shown that she is substantially limited in her ability to perform these activities.[38]

Plaintiff claims that she asked to submit reports late while on the PIP as an accommodation.  (Pl.: 252-253).  However, Plaintiff did in fact submit the required reports late on multiple occasions, but was not disciplined or penalized for doing so.  Plaintiff also claims that Innovex failed to accommodate her by denying her request to transfer from the one account in Ortiz's territory for which she was responsible.  (Pl.: 256-257).  There is no evidence that transferring Plaintiff from a single account would have eliminated her symptoms.  Moreover, Innovex was not required to reallocate Plaintiff's duties by assigning one of her accounts to another NNE.  Holbrook v. City of Alpharetta, 112 F.3d 1522, 1528 (11th Cir. 1997).

**E.**     **Plaintiff's ADEA Claim is Barred:**  Plaintiff claims that she was denied two

---

[38]  See Sutton v. United Air Lines, Inc., 527 U.S. 471, 488-489 (1999) (a limitation that can be controlled by mitigating measures such as medication will not support a disability claim); Knight v. Computer Sciences Raytheon, No. 6:00CV1563ORL28DAB, 2002 WL 32818520, at * 7-8 (M.D.Fla. Oct. 25, 2002) (lifting restrictions and occasional need for assistance getting dressed did not render plaintiff substantially limited); Williamson v. Int'l Paper Co., 85 F.Supp.2d 1199, 1202 (S.D.Ala. 1999) (intermittent difficulty walking not substantial limitation).

US2000 9762838.1

NPS positions with Ortho because of her age.  (Pl., p. 330).  Plaintiff cannot state a claim of

age discrimination because she never filed a charge of discrimination against Innovex

alleging such a claim.[39]  Plaintiff did not check the "age" box on her charge and did not refer

to age discrimination in her statement of facts.  Accordingly, it should be dismissed.

Maynard v. Pneumatic Prods. Corp., 256 F.3d 1259, 1262 (11th Cir. 2001).  Regardless,

Plaintiff admits no one from Innovex had any involvement with that decision or Ortho's

hiring of NPSs generally.  (Pl., pp. 331, 340-341).

      **F.**     **Plaintiff's State Law Claims Should be Dismissed**: As discussed in

Defendant Quintiles's Motion for Summary Judgment (p. 11-13) and incorporated herein by

reference, Plaintiff's claim that Innovex negligently retained and supervised Phillips and

Ortiz depends on the existence of an employer-employee relationship between Innovex and

Phillips and/or Ortiz.[40]  See Sullivan v. Lake Region Yacht & Country Club, Inc., No. 97-

1464-CIV-T-17A, 1997 WL 689799, * 3 (M.D.Fla. Oct. 21, 1997).  The same is true of her

claim that Innovex is either directly or vicariously liable for alleged assault and battery by

Phillips and Ortiz.[41]  It is undisputed that Phillips and Ortiz were not employed by Innovex.

---

[39]   See 29 U.S.C. § 626(d)(2); Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1291 (11th Cir. 2002).

[40]   When considering whether an employer-employee relationship exists, courts apply common-law principles of agency.  Kolczynski v. United Space Alliance, LLC, No. 6:04CV716ORL-18KRS, 2005 WL 2291706, at *3 (M.D. Fla. Sept. 20, 2005).  The right to control the employee is determinative, including the right to hire, fire, transfer, promote, or discipline, and the obligation to pay or train the employee.  Id.  Innovex did not have such authority over the NPSs, nor did it pay their salaries or evaluate their job performance.

[41]   See Meyer v. Holley, 537 U.S. 280, 285 (2003), citing Restatement (Second) of Agency § 219(1) (1957) (vicarious liability cannot exist absent an employer or other principal-agent relationship); Vermeulen v. Worldwide Holidays, Inc., 922 So.2d 271, 275 (Fla. 3d DCA 2006) (defendant travel agency not liable for the alleged negligence of tour operator because tour operator was not defendant's agent); Georgia-Pacific Corp. v. Charles, 479 So.2d 140, 142-145 (Fla. 5th DCA 1985) (employer not liable for torts caused by independent contractor); Pub. Health Trust v. Valcin, 507 So.2d 596, 601 (Fla. 1987) (hospital not be found directly liable for negligence of independent contractor); K.M. v. Publix Super Mkts., Inc., 895 So.2d 1114, 1117-18 (Fla. 4th DCA 2005) (defendant not liable for alleged sexual abuse of employee's child by day-care provider, as day-care provider was not defendant's employee).

US2000 9762838.1

Submitted this 6th day of February, 2007.

/Katherine S. Birmingham
Diane L. Prucino
Georgia Bar No. 588888
Katherine S. Birmingham
Georgia Bar No. 058178
KILPATRICK STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA  30309-4530
Tel.: (404) 815-6500
Fax: (404) 815-6555
Dprucino@KilpatrickStockton.com
Kbirmingham@KilpatrickStockton.com

Robert B. Buchanan
Florida Bar No. 063400
SIBONI, HAMER & BUCHANAN, P.A.
307 Northwest Third Street
Ocala, FL  34475
Tel: (352) 629-7441
Fax: (352) 629-7745
rbbuchanan@shbocala.com

Attorneys for Defendant Innovex, Inc.

26

**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION**

BETH ANN SMITH,                             )
                                            )
    Plaintiff,                              )
                                            )          Civil Action Case Number
                                            )          5:04-CV-657-OC-10GRJ
QUINTILES TRANSNATIONAL                     )
CORP., INNOVEX, INC., ORTHO                 )
BIOTECH, INC., CRAIG PHILLIPS               )
and WILBERTO ORTIZ,                         )
                                            )
    Defendants.                             )
_____            )

**CERTIFICATE OF SERVICE**

        I hereby certify that on February 6, 2007, I electronically filed the foregoing
DEFENDANT INNOVEX INC.'S MOTION FOR SUMMARY JUDGMENT with the Clerk
of the Court using the CM/ECF system which will automatically send email notification of
such filing to the following attorneys of record:

        Samuel A. Mutch, Esq.                Anthony Hall, Esq.
        2114 NW 40th Terrace                 Fisher & Phillips, LLP
        Suite A-1                            Lincoln Plaza, Suite 1250
        Gainesville, FL 32605                300 S. Orange Avenue
                                             Orlando, FL  32801


                                    /Katherine S. Birmingham_____
                                    Attorney for Defendant Innovex, Inc.

27

US2000 9762838.1