UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

BETH ANN SMITH,

Plaintiff,

-vs-                                              Case No.  5:04-cv-657-Oc-10GRJ

QUINTILES   TRANSNATIONAL   CORP.,
INNOVEX, INC., ORTHO BIOTECH, INC.,
CRAIG PHILLIPS, and WILBERTO ORTIZ,

Defendants.

_____

## O R D E R

This employment discrimination case is before the Court for consideration of the

motions for summary judgment of Defendants Innovex, Inc. ("Innovex) (Doc. 86) and

Quintiles Transnational Corporation ("Quintiles") (Doc. 87).   The Plaintiff has filed

responses in opposition (Docs. 95 & 96), to which the Defendants have filed replies (Docs.

110 & 111).   The Defendants' motions for summary judgment are ripe for review and,

having considered the arguments of the parties, those motions are due to be granted.

## Background

The following is a recitation of the material facts viewed in the light most favorable

to the Plaintiff.  United States v.  Diebold, Inc., 369 U.S. 654, 655 (1962).

The Plaintiff, a registered nurse, is a veteran and retired officer of the Nurse Corps

of the United States Army.  In 1995, she retired from the Army for medical reasons, and

has since received a military pension, benefits from the United States Department of

Veteran's Affairs ("VA"), and disability Social Security benefits.  The Plaintiff's medical condition was originally diagnosed in 1994 as Systemic Lupus Erythamatosis ("Lupus"), but her condition has since evolved to include Rheumatoid Arthritis.  The Plaintiff has a 60% disability rating with the VA, but was allowed to attempt a trial period of employment because her symptoms appeared to be in remission.  Thus, in early 2001, the Plaintiff sought employment with Innovex.[1]

Innovex provides educational, sales, and marketing services for pharmaceutical and healthcare industries.  Defendant Ortho Biotech, Inc. ("Ortho"), is a pharmaceutical company that markets Procrit, an anemia drug.[2]  In May 2001, the Plaintiff was hired by Innovex as a Nurse Nephrology Educator (NNE).[3]  In that role, the Plaintiff provided support to pharmaceutical sales representatives ("Nephrology Product Specialists" or "NPSs") employed by Ortho by conducting educational seminars and workshops, which were attended by Ortho's customers, including physicians and patients.  The NNE program

---

[1] Innovex is a wholly owned subsidiary of Quintiles.  Throughout her Second Amended Complaint and in her responses in opposition to summary judgment, the Plaintiff alleges that she was employed by both Innovex and Quintiles.  Those allegations support the Plaintiff's theory that Quintiles is also liable for the alleged discrimination she endured.  However, because the Court finds that Innovex's motion for summary judgment is due to be granted, it need not address whether Quintiles is also liable.  Thus, without deciding whether Quintiles was the Plaintiff's employer, and for the sake of clarity, the Court will refer to the Plaintiff's employer only as "Innovex."

[2] On January 25, 2007, the Plaintiff and Defendants Ortho, Ortiz and Phillips filed a stipulation of dismissal with prejudice (Doc. 81) as to all of the Plaintiff's claims against those defendants.

[3] Nephrology is a branch of medicine concerned with the kidneys.

began in 2001 pursuant to a Master Service Agreement between Innovex and Ortho. Under that agreement, Innovex was responsible for the recruiting and hiring of NNEs, who remained under the direct authority and control of Innovex.

As an NNE, the Plaintiff was responsible for a geographic territory that included North and Central Florida. There, she worked with multiple NPSs, including Wilberto Ortiz ("Ortiz"). In addition to her daily duties within her geographic territory, a significant part of the Plaintiff's job involved her attendance at and participation in regional and national conventions sponsored by Ortho.

In October 2001, the Plaintiff attended such a national convention in Dallas, Texas. There, she asserts that she was involved in a game of pool, at which members of Ortho's management, including Craig Phillips ("Phillips"), "began a verbal game of sexually pairing co-workers." This "game" did not involve discussion of the Plaintiff, but she objected and returned to her hotel room. Within 15-20 minutes after she reached her room, Philips knocked at her door and asked to speak with her. She admitted him, and he sat down on her bed with a bottle of wine. She sat next to him, and he soon began to pull at her shirt and try to kiss her. The Plaintiff protested and demanded he leave. Phillips left, but not before allegedly grabbing the back of the Plaintiff's neck and stating that, "no one ever needs to know about this, right?"

In January 2002, the Plaintiff attended a national convention in Phoenix, Arizona. There, Ortiz invited the Plaintiff to his room prior to departing for an evening outing with other colleagues. When the Plaintiff arrived, she discovered Ortiz laying on his bed. He

3

convinced her to sit on the other bed in the hotel room, and began suggesting that they have sex and asking her what kind of underwear she wore, at one point grabbing hold of the Plaintiff and looking down her pants.  The Plaintiff continually rebuffed Ortiz, until he pulled back the covers on the bed and revealed himself wearing only his underwear.  At that point, the Plaintiff left Ortiz' room.

In June 2002, the Plaintiff attended a regional meeting in Orlando, Florida.  There, Ortiz asked the Plaintiff to accompany him to his hotel room so that he could instruct her on how to use new projection equipment for an upcoming presentation.  While the Plaintiff was setting up the equipment, Ortiz stood behind her and, when she turned around, Ortiz allegedly had his pants down and was exposing his bare genitals.  The Plaintiff then gathered her equipment and left Ortiz' room.

The Plaintiff has alleged that Ortiz continued to sexually harass her nearly every time she was required to work with him in her geographic territory or to attend local, regional or national conventions; the harassment occurred about twice a month from June 2002 to December 2002.  While the conduct by Ortiz from June until December did not rise to the level of the events at the conventions in Phoenix and Orlando, Ortiz often made inappropriate comments, moaned, whistled, stared, and touched the Plaintiff on the breasts and buttocks.  The last incident of sexual harassment alleged by the Plaintiff occurred at a Christmas party in December 2002.

In January 2003, the Plaintiff attended a national convention in Los Angeles, California.  On January 20, 2003, during a presentation by a senior Ortho representative,

4

Anderson, the Plaintiff asked a question about the treatment of congestive heart failure, an off-label use of the drug Procrit. Anderson responded negatively to the Plaintiff's question. Following that presentation, the NNEs engaged in a Sales Simulation Activity. On January 23, 2003, the Plaintiff received a "Top Tier" award for her performance in the Simulation. However, the Plaintiff was informed that Anderson complained to the Plaintiff's supervisor that several of the NNEs made the mistake of mentioning congestive heart failure during their simulations. Plaintiff did not make this error during her simulation, but she was reprimanded by her supervisor, Bonsall, and told that as a senior NNE she was going to be the one to take the blame for bringing up the issue of off-label use of Procrit to treat congestive heart failure

Following her verbal reprimand, still on January 23, 2003, the Plaintiff confronted Ortiz about his past inappropriate conduct, and she demanded that he cease harassing her.[4] Ortiz agreed to change his behavior. The Plaintiff asserts that she made up her mind to confront Ortiz after he harassed her in December 2002; the Plaintiff does not allege that she was harassed on January 23, 2003.

On January 27, 2003, the Plaintiff was contacted by Bonsall to discuss an alleged confrontation between the Plaintiff and Ortiz on January 23, 2003. According to Bonsall, Ortiz had reported that the Plaintiff inappropriately complained of her job duties and

---

[4] The Plaintiff asserts that confronting her alleged harasser was the first step in dealing with sexual harassment specified by the Innovex employee handbook.

criticized management.[5]  After being informed of Ortiz' report, the Plaintiff complained of "inappropriate" behavior by Ortiz.  Importantly, this was the first time that the Plaintiff had ever told anyone at Innovex - or anyone at all - that she had endured any sexual harassment.[6]  Bonsall informed the Plaintiff that she could file a formal complaint for sexual harassment through the human resources department, but that the Plaintiff "could be fired for anything."[7]

Following that conversation, still on January 27, 2003, the Plaintiff was placed on a Performance Improvement Plan (PIP) as a disciplinary measure.  Innovex informed the Plaintiff that it was disciplining her for inappropriately bringing up the issue of the off-label use of Procrit to treat congestive heart failure at the convention and for making unprofessional comments to a customer, Ortiz.  The PIP was effective for ninety days and prevented the Plaintiff from receiving raises or bonuses during that period.  In addition, the PIP increased the Plaintiff's daily workload, her daily and weekly reporting requirements, and the frequency of supervisory visits by Innovex management.  The undisputed evidence

---

[5] Ortiz, in his deposition, denies ever making such a report.

[6] Innovex, however, stringently contends that on January 27, 2003 the Plaintiff complained only of "inappropriate" conduct by Ortiz, and refused to explain her allegations or make any mention of sexual harassment.

[7] Innovex has asserted that Bonsall stated that she - Bonsall - could be fired for not reporting the Plaintiff's complaint to human resources.

in the record establishes that Innovex management decided to place the Plaintiff on a PIP prior to January 27, 2003.[8]

Later in January 2003, the Plaintiff received a call from an Innovex human resources representative, Chris Marcello ("Marcello").  Bonsall had informed Marcello of the Plaintiff's allegations of inappropriate behavior, and Marcello asked the Plaintiff if she wanted to file a formal complaint.  After expressing concerns about her job security, the Plaintiff chose not to file a formal complaint.  Marcello instructed the Plaintiff to call her back if she changed her mind.

The increased workload caused by the PIP exacerbated the Plaintiff's symptoms from Lupus and Rheumatoid Arthritis.  Accordingly, the Plaintiff requested additional time to complete her assignments.  Although Innovex did not explicitly grant her requests, the Plaintiff's late filing of her daily and weekly reports went unpunished by Innovex, and Plaintiff successfully completed her PIP.  The Plaintiff has alleged that during the PIP her symptoms sometimes flared up and prevented her from performing daily activities, such as holding a cup, preparing meals, driving, typing, or walking.  The Plaintiff's symptoms usually were most severe in the morning and evening, and she was able to regularly perform her job functions in the afternoon.  Moreover, changes in her medication regimen

---

[8] The record contains an unsigned PIP concerning only the matter of the off-label use of Procrit and an unsigned draft warning letter concerning only the reportedly unprofessional conversations with Ortiz.  Both of these documents are dated January 27, 2003, but the uncontradicted testimony from Innovex witnesses establishes that the PIP was contemplated and created prior to January 27, 2003.

were required to control her symptoms, which had been successfully controlled through medication prior to the PIP.  At some time following the initiation of the PIP, the Plaintiff requested that her geographical territory be changed.  Although it is unclear on what grounds the Plaintiff requested this change, the ultimate effect would have been to remove Ortiz from the Plaintiff's territory and to shrink the area of her territory.  Innovex denied this request because it did not want to sever the successful customer relationships that the Plaintiff had built.

On June 12, 2003, the Plaintiff received a "satisfactory" annual evaluation.  At that time, the Plaintiff asserts that she stated to her supervisor, Beth Morgan ("Morgan"), that the frequency of Ortiz' harassment had diminished, but that his inappropriate conduct had not totally stopped.[9]

On June 18, 2003, the Plaintiff was scheduled to give an educational seminar at Florida Hospital in Deland, Florida for patients of Nephrology Consultants, a customer of Ortho.  The Plaintiff had scheduled two business appointments in Jacksonville, Florida that morning and entirely missed the seminar in Deland that she was to conduct, arriving at least forty minutes late and after the patients had left.  At about the time the seminar was scheduled to begin, the Plaintiff called the hospital and informed a nurse she was running late.  After the nurse had spoken to the Plaintiff, the nurse provided a sign-in sheet for

---

[9] Although the Plaintiff alleges in her Second Amended Complaint that she made this statement to Morgan, she has wholly failed to identify any such harassment.  Indeed, in her deposition the Plaintiff could not identify a single act of sexual harassment by Ortiz in 2003.

those patients not wishing to wait for the Plaintiff.   In addition, an advertising flyer containing the Plaintiff's voicemail number was provided to patients.  The Plaintiff has asserted that she did not direct the nurse to provide patients with either the sign-in sheet or the flyer.  The hospital staff were upset about the Plaintiff's tardiness and contacted Ortho management to complain.

On June 23, 2003, the Plaintiff was terminated on the grounds that she had committed a second policy violation in six months.  The first violation was the January 23, 2003 incident in which the Plaintiff mentioned the treatment of congestive heart failure as an off-label use for Procrit, and the second violation concerned the June 18, 2003 incident in Deland.  According to Innovex, the collection of patient information on the sign-in sheet and the provision of the Plaintiff's telephone number to patients violated company policy, and may have violated HIPPA.  Further, dating back to her first employee evaluation in October 2001 the Plaintiff has been criticized for ongoing punctuality problems, which culminated in her termination following the June 18, 2003 incident.

On November 5, 2003, the Plaintiff filed a charge of discrimination with the Florida Commission on Human Relations and the United States Equal Opportunity Commission. That complaint alleged discrimination on the basis of sex and disability, sexual harassment, and retaliation.  The charge of discrimination made no mention of discrimination on the basis of age.  On December 17, 2004, the Plaintiff filed her Complaint in this case.  On August 16, 2005, the Plaintiff filed her Second Amended Complaint, in which she asserts nine Counts for relief.  In Counts One through Six, the Plaintiff purports to assert state law

tort claims for direct and vicarious liability based on theories of assault and battery by Phillips and Ortiz, negligent supervision of Phillips and Ortiz, and negligent retention of Phillips and Ortiz.  In Count Seven, the Plaintiff asserts a Title VII claim based on theories of hostile work environment due to the alleged harassment of the Plaintiff by Phillips and Ortiz and retaliation.  In regards to the claims of retaliation, the Plaintiff alleges that Innovex retaliated against her by: (1) making critical remarks to the Plaintiff about the dangers of filing a complaint against an employee for sexual harassment; (2) placing her on the PIP; (3) contriving to write her up for "additional alleged infractions" that either did not occur or were similar to actions by other employees for which the employees were not disciplined; (4) refusing to reassign the Plaintiff to a territory not supervised by Ortiz; and (5) terminating the Plaintiff's employment.  In Count Eight, the Plaintiff asserts a claim for employment discrimination under the Americans with Disabilities Act.  Finally, in Count Nine, the Plaintiff asserts a claim for employment discrimination under the Age Discrimination in Employment Act.

No motions to dismiss were filed in this case.  On February 7, 2007, Innovex and Quintiles filed the motions that are now under consideration.  The Plaintiff, who is represented by counsel, has responded in opposition to those motions.

## Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law."  In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party."  Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  As the Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact.  If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."  Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987).  The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. Moreover, conclusory allegations and unwarranted deductions of fact are not accepted as true.  See Eidson v. Arenas, 837 F. Supp. 1158, 1160 (M.D. Fla. 1993).[10]

---

[10] The Court takes this opportunity to note that the Plaintiff's responses in opposition to the motions for summary judgment primarily rely upon the conclusory allegations in the Plaintiff's Second Amended Complaint for support and, as such, are often divorced from the facts in the record presented to the Court.  Indeed, the Plaintiff's response in opposition to Quintiles' motion for summary judgment simply contains a paragraph-by-paragraph recitation of the allegations in the Plaintiff's Second Amended Complaint under the heading "Statement of Facts."

## Discussion

### A.    Title VII Hostile Work Environment Claim

"In a state that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002); 42 U.S.C. § 2000e-5(e).  "A claim is time barred if it is not filed within [that] time limit."  Morgan, 536 U.S. at 109.  In Morgan, the Supreme Court explained what constitutes an unlawful employment practice and when such a practice has occurred for purposes of the application of the 300 day time limit.  536 U.S. at 110.  The Court differentiated between a claim based upon a discrete act - such as termination - and a claim based upon a hostile work environment, and held that, in relation to a claim based upon a hostile work environment, "if an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for purposes of liability."  Morgan, 536 U.S. at 115.

Here, the Plaintiff filed a charge of discrimination with the Florida Commission on Human Relations and the United States Equal Opportunity Commission on November 5, 2003.  Thus, the 300 day cut-off date in this case is January 9, 2003.  The Plaintiff's hostile work environment claim concerns allegations of harassment that occurred between January 2002 and December 2002.  Critically, the Plaintiff has not established that even a single act of harassment occurred in 2003 or, more specifically, on or after January 9,

2003.   Thus, the Plaintiff has failed to identify "an act contributing to the claim [that] occur[red] within the filing period."   Morgan, 536 U.S. at 115.   Accordingly, the Plaintiff's hostile work environment claim is time barred.   Id. at 109.

## B.     Title VII Retaliation Claim

In order to establish a prima facie claim of retaliation under Title VII, a plaintiff must prove that: (1) she participated in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment action.   Brown v. Snow, 440 F.3d 1259, 1266 (11th Cir. 2006); Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998); Reis v. Universal City Development Partners, Ltd., ___ F. Supp. 2d ___, 2006 WL 2054178, * 12 (M.D. Fla. July 21, 2006).   If the plaintiff succeeds in establishing her prima facie case, the defendant must come forward with a legitimate, non-retaliatory reason for the adverse employment action.   Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001); Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998). However, the "plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct."   Olmsted, 141 F.3d at 1460.

### (i)     Protected Activity

The parties dispute the existence and, assuming its existence, the timing of any protected activity engaged in by the Plaintiff.   However, even if a genuine issue of material

13

fact exists in regards to whether and when the Plaintiff engaged in protected activity, such an issue of fact does not prevent the entry of judgment at this stage in the proceedings because the Court will take as true the Plaintiff's allegation that she engaged in protected activity the first time she disclosed to her employer Ortiz' allegedly inappropriate behavior - when she spoke with Bonsall on January 27, 2003.

(ii)     _Adverse Employment Actions_

The United States Supreme Court recently clarified the definition of an "adverse employment action" to provide that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." Burlington N. & Santa Fe Ry. Co. v. White, ___ U.S. ___, 126 S. Ct. 2405, 2415 (2006).  The Court emphasized that such adversity must be material as Title VII does not protect employees from "those petty slights or minor annoyances that often take place at work," and that whether an action is retaliatory in nature will be determined on a case by case basis. Id.  The Eleventh Circuit has applied a similar standard for quite some time.  See Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1447, 1453 (11th Cir. 1998) (a plaintiff "must demonstrate that a reasonable person in his position would view the employment action in question as adverse" and "[a]ny adversity must be material"); Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001) ("It is clear, however, that not all conduct by an employer negatively affecting an employee constitutes adverse employment action."); Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) ("Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be

14

determined on a case-by-case basis, using both a subjective and an objective standard.")
(internal citations omitted).

The Court finds that, based on the facts of this case, both the placement of the
Plaintiff on the PIP and her termination constituted adverse employment actions.  The PIP
was an explicitly disciplinary measure, the implementation of which had a material adverse
effect on the Plaintiff employment and resulted in an increased workload, increased
reporting requirements, and increased supervision.  Further, the PIP temporarily prevented
the Plaintiff from receiving pay raises or bonuses.

In addition, because the Plaintiff has failed to support in her responses in opposition
certain of her allegations of retaliation, the Court will deem those allegations abandoned,
and will only proceed with the Plaintiff's allegations of retaliation based upon the issuance
of the PIP and her termination.  The Court deems abandoned the Plaintiff's claims of
retaliation based upon: (1) making critical remarks to the Plaintiff about the dangers of filing
a complaint against an employee for sexual harassment; (2) contriving to write her up for
"additional alleged infractions" that either did not occur or were similar to actions by other
employees for which the employees were not disciplined; and (3) refusing to reassign the
Plaintiff to a territory not supervised by Ortiz.  Moreover, the Court finds that those
allegations of retaliation are neither supported by the facts in this case nor, under the
unique factual circumstances of this case, rise to the level of adverse employment actions.

(iii)    *Causal Connection*

Having determined that the placement of the Plaintiff on the PIP and her termination were adverse employment actions, the next step is determining whether a causal connection exists between those actions and the Plaintiff's January 27, 2003 complaint. To establish such a causal connection, the Plaintiff must provide evidence that:  (1) the decision-makers responsible for the adverse actions were aware of the protected activity; and (2) the adverse acts were at least somewhat related and in close temporal proximity to the protected activity.  Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004); Gupta, 212 F.3d at 590.

In regards to the placement of the Plaintiff on the PIP, there is no doubt that her discipline on January 27, 2003 was in close temporal proximity to her complaint of inappropriate behavior on that same date.  Moreover, it is clear that the Plaintiff was actually issued the PIP after she made her complaint.  However, it is equally clear that the events leading to the Plaintiff being placed on the PIP, and Innovex's decision to discipline and place the Plaintiff on the PIP all occurred on January 20 and 23, 2003 - prior to the Plaintiff's January 27, 2003 complaint, which was without dispute the first time that the Plaintiff engaged in a protected activity.  Accordingly, although the Plaintiff may not have been informed that she was being placed on a PIP until after she had made her complaint, it is clear that Innovex had already made its decision to place the Plaintiff on the PIP before - and, thus, obviously without being aware that - the Plaintiff engaged in protected activity.

16

In regards to the Plaintiff's termination, there was an approximately six-month lapse between the Plaintiff's January 27, 2003 complaint and her June 2003 termination.  Such a long time frame, by itself, cannot establish retaliation.  <u>See</u>, <u>e.g.</u>, <u>Clark County School Dist. v. Breeden</u>, 532 U.S. 268, 273-74 (2001) (three-month interval between EEOC's right to sue letter and supervisor's announcement that she was contemplating employee's transfer was insufficient to establish causation); <u>Drago v. Jenne</u>, 453 F.3d. 1301, 1307-08 (11th Cir. 2006) (three-month interval between protected acts and adverse actions is too long to establish causal connection); <u>Higdon</u>, 393 F.3d at 1221 (three-month interval between protected speech and adverse act is too long, standing alone, to establish an inference of retaliation); <u>Sierminski v. Transouth Fin. Corp.</u>, 216 F.3d 945, 951 (11th Cir. 2000) (seven-month time period between protected activity and adverse employment action is too indirect to satisfy causal connection requirement); <u>Sullivan v. National R.R. Passenger Corp.</u>, 170 F.3d 1056, 1060-61 (11th Cir. 1999) (no causal link between protected activity in February 1994 and adverse employment action in late 1994 and early 1995); <u>Vandesande v. Miami-Dade County</u>, 431 F. Supp.2d 1245, 1257 (S.D. Fla. 2006) (six month gap between alleged adverse employment action and complaint to Department of Labor is too far removed to demonstrate a causal connection).  Thus, without more, the Plaintiff cannot prove the third prong of her <u>prima</u> <u>facie</u> case.

Turning to the record presented, the Court finds a complete lack of any other evidence demonstrating causation.  First, the Plaintiff has not provided any direct evidence that Innovex's decisions to place her on the PIP or terminate her were because of, or

related to, her January 27, 2003 complaint.  See Schoenfield v. Babbitt, 168 F.3d 1257,

1266 (11th Cir. 1999) ("only the most blatant remarks, whose intent could be nothing other

than to discriminate on the basis of some impermissible factor" constitutes direct evidence).

Second, the Plaintiff cannot establish any circumstantial evidence of causation.  Other than

the Plaintiff's bare suppositions and unsupported allegations in her Second Amended

Complaint, the record is bereft of evidence to show that Innovex's decisions to place the

Plaintiff on the PIP and terminate her were related in any way to the Plaintiff's January 27,

2003 complaint.

*(iv)*     *Legitimate, Non-Retaliatory Reasons*

        Even assuming that the Plaintiff could establish a causal connection between either

her placement on the PIP or her termination and her January 27, 2003 complaint, Innovex

has met its burden of establishing legitimate, non-retaliatory reasons for those acts.  See

Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994) (this burden is

"exceedingly light," defendants need only proffer legitimate job or business reasons, not

prove them).

        Innovex has proffered legitimate, non-retaliatory reasons for placing the Plaintiff on

the PIP.  First, the record is clear that the Plaintiff asked a question related to the off-label

use of Procrit at an Ortho training seminar that irked a senior representative of Ortho,

Innovex's customer.  Further, the record is clear that several NNEs later mentioned the off-

label use in their training presentations; a result that Innovex and Ortho management

attributed to the Plaintiff.  Innovex has contended that it also placed the Plaintiff on the PIP

for having an inappropriate conversation with a customer.  Innovex placed the Plaintiff on a PIP that contained increased reporting requirements concerning her contact with customers and increased supervision after becoming aware of inappropriate comments to customers made by the Plaintiff in both an open training seminar and in a private meeting. Accordingly, Innovex has produced sufficient evidence to establish that it placed the Plaintiff on the PIP for a legitimate business reason.

Innovex has also offered legitimate, non-retaliatory reasons for terminating the Plaintiff.  According to Innovex, the Plaintiff was terminated after she failed to arrive on time for a scheduled educational program she was leading, failed to properly notify her customer or supervisors she would be late, and violated privacy policies by authorizing the use of a patient sign-in sheet and posting her voicemail number for patients.  While she disputes that she was responsible for these events, the Plaintiff does not contest that they occurred. Further, the Plaintiff had ongoing punctuality problems and had recently completed a disciplinary PIP in relation to a customer relations mishap.  Accordingly, Innovex has produced sufficient evidence to establish that it terminated the Plaintiff for a legitimate business reason.

Because Innovex has articulated legitimate, non-retaliatory reasons for both placing the Plaintiff on a PIP and terminating the Plaintiff, the burden now shifts back to the Plaintiff to identify a genuine issue of material fact with regard to whether the proffered reasons were pretextual.  Bass v. Board of County Comm'rs, 256 F.3d 1095, 1103-04 (11th Cir. 2001).  In order to show pretext, the Plaintiff must "demonstrate that the proffered reason

was not the true reason for the employment decision . . . . [The Plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981); see also Howard v. BP Oil Co., 32 F.3d 520, 526 (11th Cir. 1994) ("[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable.") (internal citations omitted).  In other words, the Court must assess "whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotations and citations omitted).

The Plaintiff has failed to meet this burden.  Other than her own bald assertions, the Plaintiff has offered no evidence that the stated reasons for the adverse actions were pretextual.  And, while she challenges her supervisors' perceptions of the events which led to her placement on a PIP and her termination, the Plaintiff does not refute the basic facts surrounding each event.  The Plaintiff also has not provided evidence of other similarly situated employees who were treated differently.  The only "evidence" the Plaintiff points to is her own subjective belief that she was retaliated against.  This is not sufficient to establish pretext, or that Innovex's reasons are not believable.  See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990) ("To survive summary judgment, the

plaintiff must then present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext.  Mere conclusory allegations and assertions will not suffice.").

## C.     *Americans with Disabilities Act Claim*

The ADA prohibits employers from discriminating in employment against otherwise qualified individuals with a disability.  To resolve a claim of disability discrimination, the Court must apply the burden-shifting analysis set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973); see also Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000).  Using this burden-shifting approach, the Plaintiff must first establish a prima facie case of discrimination by showing that: (1) she has a disability; (2) she is a "qualified individual with a disability;" and (3) Innovex unlawfully discriminated against her because of her disability.  Hilburn v. Muarata Electronics N.A., Inc., 181 F.3d 1220, 1226 (11th Cir. 1999); LaChance v. Duffy's Drafthouse, Inc., 146 F.3d 832, 835 (11th Cir. 1998).  If the Plaintiff is able to establish her prima facie case, the burden then shifts to Innovex to come forward with a legitimate, nondiscriminatory reason for failing to provide the requested accommodations.

Innovex seeks summary judgment by arguing that the Plaintiff cannot establish the elements of her prima facie case.  The Court agrees.

Innovex first argues that the Plaintiff cannot establish a claim under the ADA because she does not suffer from a disability.  In order to satisfy this portion of her prima facie case, the Plaintiff must satisfy the definition of "disability" set forth under the ADA:

21

(1) a physical or mental impairment that substantially limits one or more major life activities;

(2) a record of such impairment; or (3) being regarded as having such impairment. 42

U.S.C. § 12101(2).  An individual is deemed to be "disabled" for purposes of the ADA if she

satisfies any one of these three enumerated definitions. See 29 C.F.R. § 1630.2(g).

Neither party focuses on the "record of" or "regarded as" definitions of disability.

Rather, the focus at this stage is on the first definition of disability, i.e., actual disability.

This definition contains three elements, all of which the Plaintiff must prove. Bragdon v.

Abbott, 524 U.S. 624, 631 (1998).  First, she must have a recognized physical or mental

impairment; second, she must identify one or more "major life activities" affected by the

impairment; and third, she must show that the impairment "substantially limits" one or more

of these activities. Rossbach v. City of Miami, 371 F.3d 1354, 1357 (11th Cir. 2004).  The

first two elements are to be determined by the Court as a matter of law. See Doebele v.

Sprint/United Mgmt. Co., 342 F.3d 1117, 1129 (10th Cir. 2003).  Determining whether the

impairment substantially limits a major life activity is ordinarily a question of fact for the jury;

however, summary judgment is appropriate if the Plaintiff fails to create a genuine issue

of fact in this regard.

The first element of actual disability - that the Plaintiff suffers from a recognized

impairment - is met in this case.  Innovex does not dispute that the Plaintiff suffers from

Lupus and Rheumatoid Arthritis and that these conditions qualify as physical impairments

for purposes of the ADA.  However, a physical impairment, standing alone, does not

necessarily make one actually disabled. See Hilburn, 181 F.3d at 1226; Pritchard v.

Southern Company Services, 92 F.3d 1130, 1132 (11th Cir. 1996).  Rather, the impairment must substantially limit one or more of the individual's major life activities.  Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 725-26 (5th Cir. 1995); see also Swain v.  Hillsborough County School Bd., 146 F.3d 855, 858 (11th Cir. 1998) (a plaintiff "must provide some evidence beyond the mere existence and impact of a physical impairment to survive summary judgment").

To establish the second element of the definition of actual disability, the Plaintiff must identify the major life activities affected by her impairment.   As the Supreme Court explained, "'[m]ajor' in the phrase 'major life activities' means important.  'Major life activities' thus refers to those activities that are of central importance to daily life."  Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002).  Major life activities are enumerated under the ADA as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).   If not contained within these exemplars, the activity must be of "central importance" or "significant" to daily life.  See Toyota Motor Manuf., 534 U.S. at 197; Bragdon, 524 U.S. at 638; Rossbach, 371 F.3d at 1357.

Here, the Plaintiff maintains that during the time she labored under the PIP her symptoms sometimes flared up and prevented her from performing daily activities, such as holding a cup, preparing meals, driving, typing, or walking.  However, it is undisputed that the Plaintiff's physical impairment was, at best, intermittent and that so long as she received the correct regimen of medication she was not substantially limited in any major

life activity and could, in fact, perform functions such as caring for herself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.  In fact, other than her recurring issues with punctuality that could have been addressed by better planning, she successfully completed her work responsibilities before, during, and after the PIP.   Moreover, the Plaintiff's work responsibilities included traveling by car alone throughout North and Central Florida, eating on the go, and setting up presentation rooms and giving informational presentations at her travel destinations.  Her own satisfactory job performance in a demanding position reveals that, at least during her employment at Innovex, she was not substantially limited in any major life activity.  Thus, although the Plaintiff has an impairment, she does not have a disability under the ADA.  See Sutton v. United Air Lines, Inc., 527 U.S. 471, 488-89 (1999) (an impairment that is controlled through medication may not qualify as a disability under the ADA).

## D.    *Age Discrimination in Employment Act Claim*

It is well settled that prior to filing a discrimination action a plaintiff first must exhaust his administrative remedies by filing a charge of discrimination with the EEOC.  See Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1280 (11th Cir. 2004).  The purpose of this requirement "is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." Evans v. U.S. Pipe & Foundry Co., 696 F.2d 925, 929 (11th Cir.1983).  Thus, a plaintiff's "judicial complaint is limited to the scope of the administrative investigation which could reasonably be expected to grow out of the

charge of discrimination." Griffin v. Carlin, 755 F.2d 1516, 1522 (11th Cir.1985).  Courts are "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]," and, thus, "the scope of an EEOC complaint should not be strictly interpreted." Gregory, 355 F.3d at 1280 (quoting Sanchez v. Standard Brands, Inc., 432 F.2d 455, 460-61, 465 (5th Cir. 1970)).

Here, the Plaintiff clearly did not exhaust her administrative remedies with regards to the allegations of age discrimination in her Complaint, because she never asserted those claims in the EEOC proceedings, and there is no evidence that those claims could reasonably be expected to grow out of her Charge of Discrimination, which contains no mention of discrimination based upon age.

**E.**     ***State Law Tort Claims***

The Plaintiff failed to oppose summary judgment as to its state law claims, Counts One through Six.  The Plaintiff's failure is likely due to the fact that these claims wholly lack merit as to Defendants Innovex and Quintiles.  In Counts One through Six, the Plaintiff purports to present state law tort claims for direct and vicarious liability based on theories of assault and battery by Phillips and Ortiz, negligent supervision of Phillips and Ortiz, and negligent retention of Phillips and Ortiz.  The record is clear, however, that Ortiz and Phillips are employees of Ortho, and not employed, supervised, compensated, evaluated, or controlled in any way by Innovex or Quintiles.  Thus, neither Innovex nor Quintiles could be liable for those alleged claims.

## **Conclusion**

Accordingly, upon due consideration, it is ordered that:

(1) Defendant Innovex, Inc.'s Motion for Summary Judgment (Doc. 86) is GRANTED and the Clerk is directed to enter judgment in favor of Innovex and against the Plaintiff on all of the Plaintiff's claims against Innovex; and

(2) Defendant Quintiles Transnational Corporation's Motion for Summary Judgment (Doc. 87) is GRANTED and the Clerk is directed to enter judgment in favor of Quintiles and against the Plaintiff on all of the Plaintiff's claims against Quintiles.[11]

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 9th day of April, 2007.

_____

**UNITED STATES DISTRICT JUDGE**

Copies to:   Counsel of Record

---

[11] Because the Court finds that Innovex is entitled to judgment on all of the Plaintiffs' claims, Quintiles is also entitled to judgment because liability as the parent of Innovex was the sole basis for the Plaintiff's claims against Quintiles.  Moreover, the Court need not address Quintiles' argument that it is not a proper party to this action because it was not the Plaintiff's employer under Title VII, the ADA, the ADEA, or for purposes of the state law claims.